UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                       )
CENTURY INDEMNITY COMPANY,             )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )      CA. No. 09-285 S
                                       )
LIBERTY MUTUAL INSURANCE COMPANY,      )
                                       )
          Defendant.                   )
_____)


**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

In an earlier dispute between Emhart Industries, Inc. ("Emhart") and its insurers arising out of a superfund cleanup, Defendant Liberty Mutual Insurance Company ("Liberty Mutual") settled with Emhart. Plaintiff Century Indemnity Company ("Century"), another party to the dispute, went to trial against Emhart instead. Century prevailed on the merits, but was held responsible for a judgment of $6 million, because this Court found it was required to pay for Emhart's legal defense in connection with the cleanup. Now, notwithstanding Liberty Mutual's settlement with Emhart, Century seeks contribution from Liberty Mutual for a major portion of the judgment, on the theory that it too bore the obligation to provide a

defense.   The doctrine of equitable contribution, Century asserts, requires Liberty Mutual to pay its fair share.

The parties have cross-moved for summary judgment on these issues.   After hearing oral argument on February 2, 2010, and considering the issues carefully, the Court concludes that Liberty Mutual did have a duty to defend Emhart, for the reasons fully explained below. Nevertheless, the Court believes that Liberty Mutual must be allowed to conduct the discovery it has requested on the issue of equitable contribution.

I.   Background

    A.   The EPA Action

This dispute arises out of an enforcement action initiated by the Environmental Protection Agency ("EPA") pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA" or "Superfund").   In 1998, the EPA detected hazardous chemicals at the Centredale Manor Superfund Site (the "Site") in North Providence, Rhode Island.   (See Def.'s Statement of Undisputed Facts, Dec. 1, 2009 ("Def.'s Facts") ¶ 22.)   Between 2000 and 2003, the agency issued several Administrative Orders to Emhart identifying it as a "potentially responsible party" for cleanup costs under CERCLA.   The orders charged that the operations of Emhart's

corporate predecessors at the Site had resulted in the release or threatened release of hazardous substances. The documents set forth the following allegations:

- "Hazardous substances were disposed of at the Site as part of former operations of several chemical companies . . . and a drum recycler . . . ." (Def.'s Facts ¶ 25.)

- "Emhart is also a successor to liability of several chemical companies which operated at the Site from approximately 1943 to approximately 1971. The chemicals manufactured by these companies included hexachlorophene. The chemical companies also buried drums and other containers at the Site." (Id.)

- "[An Emhart predecessor] operated at the Site from approximately 1952 to approximately 1969. [The company's] operations included obtaining 55-gallon drums containing residual chemicals, disposing of certain drum residuals in the soil at the Site and incinerating other drum residuals at the Site." (Id.)

- "There is evidence that drums and other waste material may be buried at the property. Drum carcasses were found by EPA in certain areas of the Site. Buried drums and waste material may be leaching contaminants into the Woonasquatucket River." (Id.)

- "[H]igh levels of chlorinated solvents . . . found at the groundwater/surface water interface in the river indicate migration of contaminants from suspected buried waste near the riverbanks." (Id.)

- "Evidence suggests that the operations of the chemical companies and the drum reconditioning facility at the Site resulted in releases and threats of releases of hazardous substances at the Site." (Id.)

- In the "Site History" portion of the second Administrative Order, issued in March 2001, the EPA noted that "a major fire in the early 1970s destroyed most of the structures at the Site." (Pl.'s Statement of Undisputed Facts, Sept. 17, 2009 ("Pl.'s Facts") ¶ 6.)

In the course of responding to the EPA charges, Emhart incurred substantial legal defense costs.

During various time periods when the Site allegedly became contaminated, Emhart's corporate predecessors purchased insurance coverage from a number of companies, including Century and Liberty Mutual. Liberty Mutual's policy contained a so-called "pollution exclusion," which appears as boilerplate in many liability policies, that provides as follows:

> [T]he insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

(Def.'s Facts ¶ 27.) Century's policy contained a narrower exclusion for liability arising out of the release of waste products, which disclaimed coverage only for "intentional" or "willful" pollution. (See id. ¶ 28.)

B.   The Emhart Insurance Litigation

In January 2002, Emhart sued Century and Liberty Mutual, along with several of its other insurers, in this Court. Emhart claimed the insurers were obligated, under their respective policies, to pay its costs arising out of

contamination at the Site.  See generally Emhart Indus., Inc. v. Century Indem. Co., 559 F.3d 57 (1st Cir. 2009). The EPA action triggered two aspects of coverage, according to Emhart.  First, the policies created a duty to defend Emhart, requiring the insurers to pay the costs of Emhart's legal defense in connection with the EPA proceedings. Second, the policies required indemnification of the cleanup expenses Emhart was ultimately forced to pay pursuant to CERCLA.

Liberty Mutual moved for summary judgment on grounds that it bore no obligation to defend or indemnify Emhart, because of the pollution exclusion.  On February 15, 2004, Magistrate Judge Robert W. Lovegreen issued a Report and Recommendation concluding that Liberty Mutual's motion should be denied.  (See Report and Recommendation, Emhart v. Home Ins. Co., C.A. No. 02-53 S, Doc. # 220 (D.R.I. Feb. 15, 2004) (hereinafter "R&R").)  In large part, this conclusion rested on the reference to a "major fire" in the EPA documents, as well as evidence regarding the fire that had arisen during discovery:

> [B]eginning with the Second Administrative Order by EPA, there was the suggestion of a possibility that a major fire . . . may have contributed to the spread of contaminants on the Site and beyond it. Whether such an event would qualify as the "sudden and accidental" occurrence necessary to indicate at least a duty to defend under the

Policies, is a question of fact not suitable for resolution at summary judgment.

(Id. at 60.)   Liberty Mutual objected to the R&R, but subsequently settled with Emhart's parent company for $250,000 before the Court ruled on the objection.   See Emhart Indus., 559 F.3d at 61.

Century, on the other hand, chose to go to trial.   A jury found that Century had no duty to indemnify Emhart under the policy at issue.   However, this Court subsequently granted Emhart judgment as a matter of law on its duty to defend claim.   The Court found that Century's pollution exclusion did not apply, because the EPA documents did not state that the discharge was "intentional" or "willful."   Therefore, the Court entered judgment against Century.   See Emhart Indus., 559 F.3d at 64.   Century has since satisfied the judgment and paid more than $6 million in principal and prejudgment interest. (See "Pl.'s Facts" ¶¶ 19-21.)

Prior to the Court's decision, Century had asserted cross-claims against the other insurers, including Liberty Mutual, for allocation of any defense and indemnity costs determined to be owed to Emhart.   After ruling in Emhart's favor against Century, the Court dismissed all cross-claims without prejudice.

6

C.   The Current Lawsuit

Century now renews its claims against Liberty Mutual from the earlier lawsuit, seeking to recover a portion of the judgment paid to Emhart.   There are two steps to Century's argument: first, Liberty Mutual had a duty to provide a legal defense to Emhart in connection with the EPA charges under Massachusetts law, which governs Emhart's policies from Liberty Mutual; and second, as a result, Liberty Mutual is liable to Century under Rhode Island law, which governs equitable claims among the parties, pursuant to the doctrine of equitable contribution.   According to Century, the doctrine requires Liberty Mutual to cover its share of defense costs by paying Century to offset its liability to Emhart.

II.   Liberty Mutual's Duty to Defend

For purposes of whether Liberty Mutual had a duty to defend Emhart, the most critical material facts of this dispute are the substantive assertions contained in the EPA charges against Emhart and the language of Liberty Mutual's policies.   There is no dispute about the content of those documents, or that Massachusetts law governs the policies. Furthermore, the parties agree that Liberty Mutual's settlement with Emhart is not relevant to the scope of its duty to defend the company.   Thus, resolving the first

7

issue raised by the parties' motions turns entirely on the question of whether Massachusetts law required Liberty Mutual to defend Emhart against the EPA charges.

A.   Scope of the Duty to Defend

Under Massachusetts law, an insurer's duty to provide a defense against third-party claims pursuant to a liability policy arises "if any allegations in the complaint [are] reasonably susceptible of an interpretation that they stated or adumbrated a claim covered by the policy." Home Ins. Co. v. Liberty Mut. Fire Ins. Co., 830 N.E.2d 186, 192 (Mass. 2005) (quoting Liquor Liab. Joint Underwriting Ass'n of Mass. v. Hermitage Ins. Co., 644 N.E.2d 964, 967 (Mass. 1995) (alterations omitted)).

> The underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage. However, when the allegations in the underlying complaint lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate or defend the claimant.

Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E. 2d 522, 531 (Mass. 2003) (internal citations, alterations, and quotation marks omitted). Thus, under this "liberal" defense rule, Home Ins., 830 N.E.2d at 192, "[t]he duty to

defend is broader than the duty to indemnify." <u>Herbert A.</u>
<u>Sullivan</u>, 788 N.E.2d at 531.

Because duty-to-defend questions are generally decided
via a facial comparison of the policy to the allegations
against the insured, some courts refer to the standard as
the "pleadings test." <u>Siebe, Inc. v. Louis M. Gerson Co.</u>,
908 N.E.2d 819, 827 (Mass. App. Ct. 2009).  Nevertheless,
the duty to defend may also rest on "those facts which are
known by the insurer." <u>Boston Symphony Orchestra, Inc. v.</u>
<u>Commercial Union Ins. Co.</u>, 545 N.E.2d 1156, 1158 (Mass.
1989).  Such facts can only expand the duty; they cannot
narrow it.  The insurer cannot escape its obligation to
provide a defense based on evidence outside the complaint.
<u>See</u> <u>Sterilite Corp. v. Cont'l Cas. Co.</u>, 458 N.E. 2d 338,
344 (Mass. App. Ct. 1983).

In terms of timing, the duty to defend takes effect
when a complaint "reasonably susceptible" to coverage is
filed, and continues until the insurer obtains a judgment
that there is no coverage.  <u>Lumbermens Mut. Cas. Co. v.</u>
<u>Belleville Indus., Inc.</u>, 555 N.E.2d 568, 575 (Mass. 1990)
(discussing the need for a "conclusive" and "unalterable"
determination of no coverage for duty to expire).  In this
case, those dates begin when the EPA issued its charges
(starting in February 2000), and end when the jury

delivered its verdict in the Emhart trial (October 19, 2006).

B.   Collateral Estoppel

As a threshold matter, Liberty Mutual asserts that Century is collaterally estopped from contending that Liberty Mutual had a duty to defend Emhart.  Liberty Mutual claims the jury in the Emhart lawsuit decided an issue that effectively resolves the current dispute in its favor.  But because the jury verdict was tangential to the issue now before the Court, this argument fails.

One question put to the jury in the prior case was whether another insurer, North River Insurance Company, was required to indemnify Emhart.  North River's policy only provided for indemnification, not for defense against third-party claims.  It contained a pollution exclusion that was nearly identical to the one in the Liberty Mutual policy, and that carved out the same "sudden and accidental" exception.  (Def.'s Facts ¶ 29.)  The jury found the contamination at the Site was not sudden and accidental, and therefore that North River was not required to indemnify Emhart.

"[C]ollateral estoppel, or issue preclusion, means that when a factual or legal issue has once been determined by a valid and final judgment, that issue cannot again be

litigated between the same parties in any future lawsuit."
Coors Brewing Co. v. Mendez-Torres, 562 F.3d 3, 8 (1st Cir.
2009) (internal quotation marks and citation omitted).
According to Liberty Mutual, this doctrine prevents Century
from arguing that any pollution at the Site was "sudden and
accidental," because the jury in the related case found
otherwise.   Therefore, Liberty Mutual asserts, there can be
no dispute that it owed Emhart no duty to defend, since its
own policy also prohibits coverage unless pollution was
"sudden and accidental."

This is a non-sequitur.   Liberty Mutual concedes that,
to establish collateral estoppel against Century, it must
demonstrate that there is an "identity of issues."   McCrory
v. Spigel (In re Spigel), 260 F.3d 27, 33 (1st Cir. 2001).[1]
It plainly cannot do so.   The verdict in the prior case
pertained to the duty to indemnify.   The issue here is the
duty to defend.   There is no "identity" between the two.
As indicated above, the latter is "broader" than the

---

[1] There is some ambiguity about whether federal or state
issue-preclusion law applies to judgments of federal courts
sitting in diversity jurisdiction.   See Lynch v. Merrell-
Nat'l Labs., Div. of Richardson-Merrell, Inc., 830 F.2d
1190, 1192 (1st Cir. 1987) (raising the possibility that
federal law applied but not deciding the question).   Even
if federal law controls, Liberty Mutual still must show
that "the issue sought to be precluded in the later action
is the same as that involved in the earlier action."
Ramallo Bros. Printing, Inc. v. El Dia, Inc., 490 F.3d 86,
90 (1st Cir. 2007).

former.  Herbert A. Sullivan, 788 N.E.2d at 531.  Thus, in many instances, an insurer will have to defend a policy holder, but will not ultimately have to pay the proceeds of any judgment obtained by a third party.  Liberty Mutual's issue preclusion theory turns this regime inside-out.  The tacit logic of the argument is that the absence of the narrow duty — which Century cannot contest as a matter of res judicata — extinguished the broader one.  By the same reasoning, one might argue that, because a person is not Larry Bird, he must not be a basketball player.

Liberty Mutual also cannot rely on the fact that the defense obligation expires upon a ruling that there is no coverage for liability to third parties.  As the Court noted in its decision in the prior lawsuit, and as the First Circuit repeated in affirming the judgment for Emhart, "generally, an indemnity finding favorable to an insurer does not erase that insurer's defense obligations, as long as the pleadings test has been satisfied."  Emhart, 559 F.3d at 74 (discussing Rhode Island law) (citation, internal quotation marks and alterations omitted); see Sterilite, 458 N.E.2d at 343 (explaining that an insurer can "get clear of the duty [to defend] from and after the time when it demonstrates with conclusive effect" that there is no coverage for liability to third parties)

(emphasis added).   Thus, a no-coverage determination does not allow an insurer to recoup prior defense expenditures on behalf of the insured.   In other words, even if the jury verdict discontinued Liberty Mutual's duty to defend as a matter of claim preclusion, it could not retroactively efface whatever duty attached prior to the date of the verdict.

It therefore does not matter whether Century can re-litigate the question of whether pollution at the site was "sudden and accidental" as a matter of fact, because the answer is beside the point.   Instead, the decisive question is whether the EPA charges were "reasonably susceptible" to coverage under the "sudden and accidental" clause.   The Court now turns to that issue.

C.   Are the Charging Documents "Reasonably Susceptible" to Coverage Under the Liberty Mutual Policy?

Although this case presents a close question, the Court concludes that the charging documents against Emhart did activate Liberty Mutual's duty to defend the company under the "liberal" standards set by Massachusetts law. See Home Ins., 830 N.E. 2d at 192.   As fully explained below, the EPA documents are "reasonably susceptible" to the interpretation that at least part of the pollution resulted from a "sudden and accidental" event —

13

specifically, the fire that destroyed chemical facilities at the Site in the 1970s.

### 1.  The allegations do not foreclose coverage

To begin with, the charging documents do not assert that all the environmental damage was non-sudden and non-accidental.  Instead, as Judge Lovegreen observed in the Report and Recommendation issued in the prior lawsuit, they "lack . . . conclusions . . . . with respect to the nature and source of the contamination."  (R&R at 58.)  For example, some of the allegations are vague about timing.  One claims that "the operations of the chemical companies and the drum reconditioning facility at the Site resulted in releases and threats of releases."  (Def.'s Facts ¶ 25.)  This charge does not detail the time frame in which the "releases" occurred.

True, other allegations point the finger at waste disposal practices of Emhart's corporate predecessors.  These, Liberty Mutual contends, can only be consistent with deliberate and gradual pollution.  One of the documents states that "[h]azardous substances were disposed of at the Site as part of former operations" of several companies. (Id.)  It further asserts that companies "buried" and "incinerat[ed]" drums and other waste containers.  (Id.) However, as the Court ruled in the Emhart lawsuit, "[n]one

14

of [the EPA] documents allege the <u>intentional</u> or <u>willful</u> introduction of waste products at the Site." <u>Emhart Indus., Inc. v. Home Ins. Co.</u>, 515 F. Supp. 2d 228, 245 (D.R.I. 2007) (emphasis in original). Plus, not all of the charges blame the problem on "disposal" or "burials." Some refer more generally to chemical manufacturing and company operations. (<u>See</u> Def.'s Facts ¶ 25.)

Thus, at a minimum, the documents do not make it clear that all the contamination was either gradual or intentional. Some authority suggests this is sufficient to mandate defense coverage under Liberty Mutual's policies. For example, in <u>In re Acushnet River & New Bedford Harbor</u>, 725 F. Supp. 1264 (D. Mass. 1989), one of many decisions to address the duty to defend under the ubiquitous "sudden and accidental" clause, the government presented the following accusations to the insured parties:

> [The insureds have] thrown, discharged, deposited or caused, suffered, or procured to be thrown, discharged or deposited from their manufacturing establishments refuse contaminated with [chemicals], and other refuse matter, into [an] [e]stuary and New Bedford Harbor, and the tributaries of such waters, without permits issued by the Secretary of the Army.

<u>Acushnet River</u>, 725 F. Supp. at 1269. If anything, these assertions left less room for the possibility of "accidents" than any charge against Emhart. The term

"thrown" is just as suggestive of intentional conduct — and thus inconsistent with "accidental" releases — than any language used in the EPA documents. The complaint also implied that the insured's violation was not the pollution itself, but a failure to obtain permits. Such a lapse, of course, cannot be a sudden accident. Yet, the court concluded that the allegations summoned the duty to defend under Massachusetts law:

> Nothing in the complaint alleges that all the releases were both non-sudden and non-accidental. Therefore, the insurers must undertake the defense of the insured unless they can conclusively prove that every single release was non-sudden and non-accidental.

Id.

The First Circuit reached the same conclusion about similar allegations in Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 35 (1st Cir. 1997), which also considered the duty to defend under Massachusetts law. The court summarized the complaints as referring to the insured's "generation of hazardous wastes disposed of at . . . [one] site and the spillage of [chemicals] at [a second] site." Millipore, 115 F.3d at 35. The mention of "spillage," like the term "releases" in the EPA documents in this case, was ambiguous: from the court's description, it is not clear whether the complaints identified the circumstances or

16

cause of the spill.   Yet, the allegations did apparently attribute the damage at one site to "dispos[al]" of waste by the insured.   Together, "[t]hese events [were] clearly occurrences under the . . . policies," according to the court.   Id.   It reasoned that, "while the resulting damage is pollution related, it at least arguably falls under the [sudden and accidental] exception."   Id.   The court therefore found that the insurer could not disclaim the duty to defend.

Accordingly, like the allegations in Acushnet River and Millipore, the charges here link some releases to waste disposal, but do not clarify that all pollution was gradual or intentional.   Hence, they "at least arguably" call for coverage under the "sudden and accidental" clause and therefore summon Liberty Mutual's duty to defend.   Id.

 2.  The documents identify a potential "sudden and accidental" release

It is not good enough, Liberty Mutual says, that the allegations fail to rule out coverage.   A complaint must do more than reveal the absence of a negative.   For the duty to defend to arise, an "ordinary intelligent person reading the complaint" must be able to identify alleged events that fall within the policy.   Liberty Mut. Ins. Co. v. SCA Servs., Inc., 588 N.E.2d 1346, 1350 (Mass. 1992) (referring

17

to the "only reasonable reading of the underlying complaint"); see Employers Ins. of Wausau v. George, 673 N.E.2d 572, 575 (Mass. App. Ct. 1996) (stating that "speculation" that a covered event "may have occurred" does not meet the standard) (quotation marks and citation omitted).

Consequently, for a complaint to trigger the duty to defend under the "sudden and accidental" clause, it must describe "an abrupt discharge or release." SCA Servs., 588 N.E.2d at 1349. (quoting Lumbermens, 555 N.E.2d. at 568). This is because the term "sudden" has a "temporal element" under Massachusetts law. Id. In SCA Servs., the complaint did not measure up, because the waste deposits it chronicled were too gradual:

> The pollution alleged in this case was not "sudden" . . . . The complaint details routine business activity lasting over several months in which the toxic contents of the barrels brought by SCA to the landfill were either emptied into open trenches or dumped into trenches and flattened with a bulldozer. To an ordinary intelligent person reading the complaint in the New York action, it is evident that the government asserts contamination of the site, and the surrounding area and waters due to continuous waste disposal practices occurring over a protracted period of time as a concomitant part of a regular business activity. Such a situation is within the pollution exclusion because it is not "sudden and accidental."

SCA Servs., 588 N.E.2d at 1349-50.

What tips the scales in favor of recognizing a duty to defend here is that, unlike the complaint in SCA Servs., the EPA documents meet the standards established in that case.   Contrary to Liberty Mutual's suggestion, an "ordinary intelligent person" could find that the documents reveal a possible "abrupt discharge or release" of hazardous chemicals at the Site.   Not only do the allegations fail to rule out this possibility — in contrast to the unmistakable course of "routine" conduct depicted in the complaint in SCA Servs, see id. at 1350[2] — but they also identify a specific sudden, destructive event that may have caused some of the contamination.   The EPA's March 2001 Administrative Order tells of "a major fire in the early 1970s" that "destroyed most of the structures at the Site." (Pl.'s Facts ¶ 6.)   In the absence of any allegation about arson, it is reasonable to assume the fire was a sudden accident.   Moreover, it is also reasonable to conclude that

---

[2] The insured in that case had, "through its agents, servants and employees, contacted [the landfill operator] and arranged to dispose of industrial and chemical wastes at the . . . landfill site."   Liberty Mut. Ins. Co. v. SCA Servs., Inc., 588 N.E.2d 1346, 1348 (Mass. 1992) (alterations in original).   "Pursuant to this arrangement," the allegations continued, the company transported "several thousand barrels" of waste to the site over a period of several months "in trucks driven by its own employees" or private contractors.   Id.   Thus, the only reasonable conclusion was that the insured had "routine[ly]" mishandled waste.   Id. at 1351.

the destruction of chemical facilities may have contributed to the extensive chemical contamination later discovered at the Site.[3]

Liberty Mutual dismisses the fire as a red herring. The EPA does not attribute any pollution to the event, but rather mentions it in the "Site History" portion of the Order. The charges setting forth Emhart's liability, Liberty Mutual says, identify business activities and waste disposal practices as the real culprits. Thus, it professes, by itself the passing allusion to a fire cannot support the duty to defend.

There are two gaps in this line of defense. First, the Court cannot ignore facts favorable to an insured simply because they are presented as background information. It must consider such allegations, along with the specific accusations against the insured, to determine whether the charging documents state a claim that conjures the duty to defend. See Travelers Indem. Co. of Ill. v. United Food & Commercial Workers Int'l Union, 770 A.2d 978, 989-90 (D.C. 2001) (finding a duty to defend under South Carolina law, and rejecting the insurer's argument that key facts in a complaint were "merely background allegations

_____

[3] Again, the apparent rejection of that theory by the jury in the Emhart lawsuit is irrelevant.

providing color for" a non-covered claim, because those facts facially stated a covered claim).

Second, even assuming the most reasonable reading of the charges is that most of the pollution was gradual and non-accidental, this is not dispositive. Under Massachusetts law, the fact that a policy excludes the majority of damages set forth in a complaint does not lift the duty to defend. Rather, the duty continues if even a small amount of harm could be attributable to a covered event. In Acushnet River, as noted, the complaint left open the possibility of "sudden and accidental" pollution, and thus foisted the duty to defend on the insurer. However, the insurers' "ultimate duty to indemnify . . . appear[ed] limited to only a small fraction of the damages which may ultimately be recoverable." Acushnet River, 725 F. Supp. at 1280. The "proportion of . . . pollution which may . . . be characterized as 'sudden and accidental'" was likely to be "de minim[i]s" and "perhaps infinitesimal." Id. at 1279-80. Yet, this did not change the conclusion that the insurer bore "an undoubted duty to defend" under Massachusetts law. Id. at 1279-80.

No decision the court has located in Massachusetts has debunked the premise that the defense obligation persists in the face of "negligible" or "infinitesimal" liability

for damages.  The Massachusetts Supreme Judicial Court in Lumbermens did not criticize the assumption that an "undoubted duty to defend" could coexist with a "negligible duty to indemnify," which was built into a question of law certified by the Acushnet River decision.[4]  Id. at 1280.  As a result, it is clear that the portion of alleged damages a policy might ultimately cover does not need to exceed a de minimis amount to sustain the duty to defend, until the insurer obtains a judgment in its favor.

In sum, the fire at the Site qualifies as a "sudden and accidental" event that might have contributed to the contamination.  The mention of it in the EPA documents, and the absence of any allegation that all the pollution was gradual, imposed the duty to defend on Liberty Mutual.  The fact that the charges do not say the fire caused any chemical releases, and thus that its impact on damages may

---

[4] The question was whether "there is any procedure whereby an insurer with an undoubted duty to defend but with a negligible duty to indemnify can bring the continuing duty to defend to an end short of conclusively establishing as against the plaintiff in the underlying action the extent of the claim that is covered by the insurance."  Acushnet River,725 F. Supp. at 1280.  In Lumbermens, the Massachusetts high court answered that an insurer may do so by seeking a declaratory judgment to the effect that its policy provides no coverage.  See Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 555 N.E.2d 568, 575 (Mass. 1990).

have only been *de minimis*, did not eliminate Liberty Mutual's obligation.

### 3. "Extrinsic" evidence

In general, the "pleadings test" for determining the duty to defend "is based exclusively on the facts as alleged rather than the facts as they actually are." SCA Servs., 588 N.E. 2d at 1349 n.4. The EPA documents bound Liberty Mutual to defend Emhart under this standard, because they disclosed the fire in March 2001. But the inquiry is not always limited to the four corners of a complaint. See Boston Symphony Orchestra, 545 N.E. 2d at 1158 (explaining that the defense obligation may rest on "those facts which are known by the insurer"). In fact, some decisions rely on factual disputes arising after a complaint is filed in sustaining the duty to defend. For instance, in Nashua Corp. v. First State Ins. Co., the Massachusetts Supreme Judicial Court denied summary judgment to an insurer on both defense and indemnification claims. 648 N.E.2d 1272, 1276 (Mass. 1995). The court did not provide a separate analysis of the duty to defend. Instead, it appeared to assume that the existence of a "factual question" as to the ultimate issue of whether the "sudden and accidental" clause covered the damages at issue also precluded summary judgment on the defense obligation.

Id. at 1276.

As the jury verdict in the Emhart lawsuit demonstrates, a central fact dispute in the case concerned whether pollution at the Site could have been "sudden and accidental." See Emhart, 515 F. Supp. 2d at 267-68. To the extent that Nashua Corp. can be interpreted as expanding the duty to defend based on such disputes, it reinforces the conclusion that Liberty Mutual bore that duty.

D.   Conclusion

For each of the reasons stated above, the Court concludes that Liberty Mutual did, in fact, owe Emhart a duty to defend. It now turns to Century's argument that this entitles it to equitable contribution from Liberty Mutual.

III. Equitable Contribution and Liberty Mutual's Rule 56(f) Motion

Century next argues that, because Liberty Mutual shared the duty to defend Emhart with Century, the two insurers were "joint obligors" with respect to the judgment Century paid to Emhart. Kerney v. Kerney, 386 A.2d 1100, 1103 (R.I. 1978). This, Century claims, requires Liberty Mutual to make an "equitable contribution" to Century under Rhode Island law, which governs the equitable duties among

the parties.  Id. at 1103; see Thomas v. Jacobs, 751 A.2d 732, 734 (R.I. 2000) (explaining that the right to EC from co-guarantors is "implied by law and governed by equitable principles").  The payment would cover what Century says is Liberty Mutual's portion of the judgment to Emhart.

Liberty Mutual responds that, if the Court finds Liberty Mutual bears the duty to defend along with Century — as it has done — it is premature to address the issue of equitable contribution.  Liberty Mutual moves pursuant to Rule 56(f) for a continuance to conduct discovery in two areas it claims must be explored to assess whether contribution is warranted.  See Fed. R. Civ. P. 56(f) (explaining that a party may request leave to conduct discovery in response to a motion for summary judgment if it can demonstrate that otherwise it "cannot present facts essential" to its opposition).  One, it asks to investigate whether Century attempted to mitigate its damages, which it had the duty to do under Rhode Island law, through reasonable settlement efforts.  See McFarland v. Brier, 769, A.2d 605, 610 (R.I. 2001) ("[A] party claiming injury has a duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages.").  Two, Liberty Mutual seeks to learn whether any of Emhart's other insurers also owed it a duty to defend, which could make

them necessary parties for purposes of allocating defense costs equitably.

Century objects that Liberty Mutual has not met the prerequisites for Rule 56(f) relief.  In general, a party making a Rule 56(f) motion must "demonstrate that it was diligent in pursuing discovery before the summary judgment initiative surfaced."  C.B. Trucking, Inc. v. Waste Mgmt., Inc., 137 F.3d 41, 44 (1st Cir. 1998).  A party should also "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist."  Id. (internal quotation marks and citation omitted); see Rivera-Torres v. Rey-Hernandez, 502 F.3d 7, 12 (1st Cir. 2007) (criticizing "[s]peculative conclusions" as inadequate for Rule 56(f) motions). However, the question of whether discovery is appropriate ultimately falls within the Court's discretion.  See Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 859-60 (1st Cir. 2008) ("[T]he trial judge has broad discretion in ruling on pre-trial management matters, and we review the district court's denial of discovery and its denial of a Rule 56(f) motion for abuse of its considerable discretion.") (citation, internal quotation marks and alterations omitted).

Liberty Mutual, Century complains, has not identified any facts that suggest Century passed up reasonable settlement offers from Emhart during the prior trial, or took any unreasonable litigation strategies. It also has not set forth a plausible basis to believe there is any additional relevant information about other insurers' liability for defense costs that was not unearthed in the Emhart lawsuit, according to Century.

The Court is sympathetic to the grievance that Liberty Mutual's discovery requests come late in the day. Nevertheless, it concludes that a short period to conduct limited discovery will further the full and fair resolution of the dispute over equitable contribution. There has never been a discovery cut-off in this case, since the parties proceeded directly to dispositive motions after Century initiated the action. Thus, the Court is confident that Liberty Mutual is not using Rule 56(f) to flout a scheduling order, or to make up for dallying during a discovery period. Cf. Nidds v. Schindler Elevator Corp., 113 F.3d 912, 921 (9th Cir. 1996) (affirming denial of Rule 56(f) motion where the district court had granted additional time for discovery but the party opposing summary judgment failed to utilize the time provided). Furthermore, in the prior case, after Liberty Mutual

settled with Emhart, the Court reset the discovery schedule several times. Having previously exercised lenience in favor of Century and other parties who chose not to settle before trial, thereby consuming more of the Court's resources, the Court sees no reason now to deny Liberty Mutual the same courtesy. See 10B Charles Alan Wright et al., Federal Practice and Procedure § 2740 (3d ed. 1998) (explaining that Rule 56(f) "should be applied with a spirit of liberality," unless the party seeking discovery has been "lazy or dilatory").

Liberty Mutual's requests are reasonable. As for mitigating damages, during the hearing on this matter, Century conceded that it had engaged in some settlement discussions with Emhart in the prior lawsuit. The Court sees no problem in allowing Liberty Mutual to review any offers extended by Emhart, and Century's responses. Century represents that it did not receive any offers for less than the judgment it ultimately paid. If true, this should be easy enough to confirm in an affidavit, assuming there is no documentary record of negotiations.

As for joining other parties, Century insists that it had every incentive to saddle other insurers with defense liability, and has already determined that none besides Liberty Mutual is worth pursuing. The Court does not doubt

Century's diligence, but Century's judgment is not binding on Liberty Mutual.  The Court concludes that Liberty Mutual is entitled to a limited time period to conduct its own investigation.  It may be that Century has, in fact, exhausted all contribution possibilities; if true, it is in Century's interest to prove that fact to Liberty Mutual by sharing relevant information.  Century is therefore directed to make reasonable efforts to provide Liberty Mutual with information in its possession pertaining to potential contributors, and Liberty Mutual may take discovery to confirm or rebut what it knows.

Accordingly, Liberty Mutual is hereby granted 60 days to conduct discovery on the following two topics: (i) what, if any, settlement offers Emhart made to Century in connection with the claims at issue in the Emhart lawsuit, and how Century responded; and (ii) whether any other insurers owed Emhart a duty to defend the EPA action.

IV.  Conclusion

In this Opinion, the Court has ruled on the first issue raised by the parties' cross-motions, by concluding that Liberty Mutual did owe Emhart a duty to defend.  It thus GRANTS Century's motion in part, and DENIES Liberty Mutual's cross-motion in part.  However, it further GRANTS Liberty Mutual's motion for a continuance to conduct the

discovery described above before ruling on the issue of equitable contribution. The Court will schedule a status conference to discuss supplemental briefing and the joinder of additional parties, if necessary, once discovery is complete.

IT IS SO ORDERED.


*/s/ William E. Smith*
William E. Smith
United States District Judge
Date: April 27, 2010