UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                       )
CENTURY INDEMNITY COMPANY,             )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )   C.A. No. 09-285 S
                                       )
LIBERTY MUTUAL INSURANCE COMPANY,      )
                                       )
          Defendant.                   )
_____)

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

    This dispute marks one more chapter in the long running -- and constantly evolving -- battle over the clean-up of the Centerdale Manor Superfund Site (the "Site") in North Providence, Rhode Island.  This chapter involves a kind of spillover fight among two insurers who were previously allied in the defense of an action brought by Emhart Industries, Inc. ("Emhart"), the company responsible for the clean-up.  The two parted ways when one Liberty Mutual Insurance Company ("Liberty Mutual") settled for a relative pittance while the other Century Indemnity Company ("Century") marched into battle, winning a somewhat

pyrrhic victory at great expense. Century now wants Liberty Mutual to help pay the lion's share of its substantial debt for Emhart's cost of defense. While the questions raised are difficult and close, Century's tactical gambit has paid off for the reasons set forth below.

I.   Background

After being ordered by the Environmental Protection Agency ("EPA") to take remedial actions to repair damage to the Site in North Providence, Rhode Island, Emhart[1] filed a

---

[1] In a prior decision in Emhart Industries, Inc. v. Home Insurance Co., this Court provided a brief history of the beginnings of Emhart's legal involvement at the Site:

> [T]he EPA sent Emhart a Notice of Potential Liability (the "PRP Letter") on February 28, 2000. The PRP Letter informed Emhart that, under CERCLA § 107(a), it was a potentially responsible party ("PRP") based on its status as "a successor to the liability of a chemical company which operated at the Site." The PRP Letter also invited Emhart to participate in the clean-up activities at the Site.[] Shortly thereafter, on April 12, 2000, the EPA issued a Unilateral Administrative Order for Removal Action (the "First Administrative Order"), which identified certain time-critical removal actions that Emhart was required to undertake.[] Among other things, the First Administrative Order made a finding of fact that "[h]azardous substances [ i.e., dioxin] were disposed of at the Site as part of the former operations of several chemical companies," and observed that "Emhart is . . . a successor to liability of several chemical companies which

lawsuit in this Court asserting, <u>inter alia</u>, that its insurers, Liberty Mutual and Century, were obligated under their respective policies to defend and indemnify Emhart against any claims, administrative proceedings, and/or lawsuits arising from the release of hazardous substances at the Site.  Liberty Mutual settled all claims with Emhart for $250,000.  Century went to trial, after which this Court sustained the jury's finding that Century did not owe Emhart a duty to indemnify but held that Century did owe Emhart a duty to defend.  <u>See generally</u> <u>Emhart Indus., Inc. v. Home Ins. Co.</u>, 515 F. Supp. 2d 228 (D.R.I. 2007), <u>aff'd</u>, <u>Emhart Indus., Inc. v. Century Indem. Co.</u>, 559 F.3d 57 (1st Cir. 2009).  After the judgment of this Court was affirmed on appeal, Century promptly paid Emhart $6,067,290.11 in full satisfaction.

On June 29, 2009, Century brought the present action seeking equitable contribution from Liberty Mutual for the

---

operated at the Site from approximately 1943 to approximately 1971."

515 F. Supp. 2d 228, 231 (D.R.I. 2007).  In that same Opinion this Court also observed the extent to which the EPA's invitation to participate was "an invitation [] not easily declined.  As the PRP letter observes, failure to accept responsibility may result in a fine of $27,500 per day, CERCLA § 106(b), or damages well in excess of the ultimate costs of remediation."  <u>Id.</u> at 231 n.4.

payment of Emhart's defense costs. Liberty Mutual counterclaimed seeking a declaration that it (1) had no duty to defend Emhart and (2) has no obligation to contribute equitably to Emhart's defense, or, in the alternative, that any such obligation was satisfied through its settlement with Emhart. On April 27, 2010, this Court held that Liberty Mutual owed Emhart a duty to defend, but granted Liberty Mutual a limited period to conduct discovery on "(i) what, if any, settlement offers Emhart made to Century in connection with the claims at issue in the Emhart lawsuit, and how Century responded; and (ii) whether any other insurers owed Emhart a duty to defend the EPA action." Century Indem. Co. v. Liberty Mut. Ins. Co., 708 F. Supp. 2d 202, 215 (D.R.I. 2010).

Discovery has now closed. In a new round of submissions on Century's motion for summary judgment (ECF No. 7) and Liberty Mutual's cross-motion for summary judgment (ECF No. 34), the parties no longer contest the two issues on which this Court had ordered additional discovery. Liberty Mutual does not argue that Century failed to mitigate its damages by rejecting reasonable settlement offers from Emhart or that other insurers may have owed Emhart a duty to defend. Rather, the dispute has

4

now shifted to the amount of equitable contribution Liberty Mutual owes to Century.   This question implicates two difficult and important issues regarding risk allocation among insurers, particularly in large-scale environmental claims like this one:   first, the effect of Liberty Mutual's settlement with Emhart on the amount of equitable contribution it owes Century;[2] and, second, the proper method for allocating defense costs between Liberty Mutual and Century.[3]

II.  Discussion

A.   The Settlement between Liberty Mutual and Emhart

Liberty Mutual argues that its duty to defend Emhart terminated as of their March 24, 2005 settlement and that the Court should not require it to contribute to Emhart's

---

[2] For the purposes of summary judgment, Liberty Mutual concedes that "the law permits Century to seek equitable contribution for any amount that it has paid in excess of its proportionate share." (Liberty Mutual's Mem. in Opp'n to Century's Mot. for Summ. J. 10, ECF. No. 38-4 [SEALED].)

[3] The parties agree that Rhode Island law governs. Equitable principles are controlled by the laws of the forum state, here, Rhode Island, Thomas v. Jacobs, 751 A.2d 732, 733 (R.I. 2000), and thus, "[t]his Court is compelled by the United States Supreme Court to follow the Rhode Island Supreme Court in the area of choice or conflict of laws." Barkan v. Dunkin' Donuts, Inc., 520 F. Supp. 2d 333, 340 (D.R.I. 2007) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941)).

defense costs after that date.  Century disputes this claim
on several grounds.

First, Century claims that the Court has already
rejected Liberty Mutual's settlement argument, pointing to
the following excerpts from the Court's April 27, 2010
Opinion and Order:

> [T]he parties agree that Liberty Mutual's
> settlement with Emhart is not relevant to the
> scope of its duty to defend the company.
>
> . . . .
>
> In terms of timing, the duty to defend takes
> effect when a complaint "reasonably susceptible"
> to coverage is filed, and continues until the
> insurer obtains a judgment that there is no
> coverage.  In this case, those dates begin when
> the EPA issued its charges (starting in February
> 2000), and end when the jury delivered its
> verdict in the Emhart trial (October 19, 2006).

Century Indem., 708 F. Supp. 2d at 207-08 (citation
omitted).  These excerpts are taken out of context,
however, and surely were not intended to foreclose Liberty
Mutual's settlement argument.  The first excerpt is
contained in a discussion of the settlement with regard to
its effect on whether Liberty Mutual had a duty to defend
Emhart, and the second is merely a description of the
possible temporal range of that duty.  In holding that
Liberty Mutual had a duty to defend Emhart, notwithstanding

its settlement, the Court did not attempt to define the nature of any equitable burden flowing to Century from that duty. That issue was expressly reserved for the present decision. See Id. at 215 ("[The Court] further GRANTS Liberty Mutual's motion for a continuance to conduct the discovery described above before ruling on the issue of equitable contribution.").

On the merits, Liberty Mutual asserts that, because the right to equitable contribution exists to prevent coinsurers from paying more than their "fair share of a common burden," its "common burden" existed only during the period that both it and Century shared a duty to defend Emhart (i.e., prior to settlement). Thomas, 751 A.2d at 734. To hold otherwise, it posits, would frustrate the public policy in favor of settlements by penalizing insurers who settle early rather than refusing to defend. See Skaling v. Aetna Ins. Co., 799 A.2d 997, 1012 (R.I. 2002) ("It is the policy of this state to encourage the settlement of controversies in lieu of litigation.").

Century points to several cases holding that an insurer's settlement with the insured does not extinguish the right of other coinsurers to obtain equitable contribution from the settling insurer. See, e.g.,

7

Maryland Cas. Co. v. W.R. Grace & Co., 218 F.3d 204, 211
(2d Cir. 2000) ("[T]he contract of settlement an insurer
enters into with the insured cannot affect the rights of
another insurer who is not a party to it.   Instead,
whatever obligations or rights to contribution may exist
between two or more insurers of the same event flow from
equitable principles."); Sharon Steel Corp. v. Aetna Cas. &
Sur. Co., 931 P.2d 127, 139 (Utah 1997) ("[A]n insurer who
is on notice that another insurer has been paying
significant defense costs should not be allowed to settle
for a minimal sum to avoid having to contribute its fair
share.").   Further, Century also analogizes this case to
claims under the Rhode Island Joint Tortfeasor Act, which
provides that a settling joint tortfeasor is not protected
from contribution claims absent a release from the injured
plaintiff.   See R.I. Gen. Laws § 10-6-8.

     The few courts and commentators to have pondered the
issue have roundly rejected Liberty Mutual's proposed
bright line rule that "one insurer's settlement with the
insured is [always] a bar to a separate action against that
insurer by the other insurer or insurers for equitable
contribution or indemnity." Clarendon Am. Ins. Co. v. Mt.
Hawley Ins. Co., 588 F. Supp. 2d 1101, 1106 (C.D. Cal.

2008) (quoting Fireman's Fund Ins. Co. v. Maryland Cas. Co., 65 Cal. App. 4th 1279, 1289 (Cal. Ct. App. 1998)); see also Maryland Cas., 218 F.3d at 211; Certain Underwriters at Lloyd's London v. Mass. Bonding & Ins. Co., 235 Or. App. 99, 113 (Or. Ct. App. 2010); Emp'rs Ins. Co. of Wausau v. Travelers Indem. Co., 141 Cal. App. 4th 398, 405-06 (Cal. Ct. App. 2006); 15 L.R. Russ & T.F. Segalla, Couch on Insurance, § 218.29 (3d ed. 2005). By the same token, however, there is no prevailing bright line rule to the contrary--that a settlement should have no effect at all on Century's potential equitable entitlement to contribution from Liberty Mutual. Most courts, in determining the effect of such settlements, have proceeded with a view toward upholding equity and preventing unjust enrichment. See Maryland Cas., 218 F.3d at 210-12 (holding that the relevant considerations under "an equitable analysis [are] whether one party is unjustly enriched at the expense of another" and "whether the settlement of the suit was reasonable or equitable, not simply whether there was a settlement"); accord Emp'rs Ins. Co. of Wausau, 141 Cal. App. 4th at 405-06; cf. Thomas, 751 A.2d at 734 ("The doctrine of equitable contribution is applied to prevent one of two or more guarantors from being obliged to pay

more than his or her fair share of a common burden, or to prevent one guarantor from being unjustly enriched at the expense of another.").

Courts have also rejected Liberty Mutual's contention that a finding against it would categorically undermine public policy by encouraging litigation in lieu of settlement. See Certain Underwriters, 235 Or. App. at 114 ("We . . . are not persuaded that a public policy favoring settlements merits a departure from the common-law rule governing equitable contribution."); Emp'rs Ins. Co. of Wausau, 141 Cal. App. 4th at 406 ("Defendants provide no authority for their ipse dixit claim that policies favoring the encouragement of settlements militate a rule that would permit a coinsurer to evade its share of the defense burden by separately settling with its insured."). Still, other courts have expressed concern that condoning such settlements could create an "incentive for an insurer to engage in 'sharp practices' to settle for a limited amount with the possibly unsophisticated insured" to avoid paying contribution to a coinsurer. Sharon Steel, 931 P.2d at 139.

There is nothing about the settlement here that would appear to advance the public policy goals discussed in the

authorities.   True, Liberty Mutual settled early in the case while Century litigated its duty to defend and indemnify Emhart all the way to the First Circuit.   Yet, the $250,000 settlement between Liberty Mutual and Emhart was but a slice of a confidential global settlement, involving many different matters.   As it was reached after Emhart had already incurred approximately $2 million in defense costs, it seems unlikely that Emhart would have agreed to such a discounted sum, absent terms more favorable to it elsewhere in the global settlement agreement.   Moreover, and quite tellingly, the settlement neither required Emhart to release any claims against Century nor obligated it to indemnify Liberty Mutual in the event Century sought contribution from Liberty Mutual. What this reveals is an understanding that Emhart would no doubt seek recovery from Century; that Century could be saddled with the risk and expense of litigating with Emhart; and that Liberty Mutual could sit back and preserve these arguments until now.   This tactical ploy made sense from Liberty Mutual's point of view, but it has done nothing to promote the policy objectives touted by Liberty Mutual now.   Moreover, Liberty Mutual's approach virtually ensured that no settlement would occur between Emhart and

Century.   Indeed, confirmation of this is that, after an opportunity for discovery on this issue, Liberty Mutual apparently found no evidence that Century unreasonably failed to settle with Emhart.   To reward Liberty Mutual for its settlement with Emhart would do nothing to serve Rhode Island's public policy of "encourage[ing] the settlement of controversies in lieu of litigation." Skaling, 799 A.2d at 1012.  Far from being a litigation killer, Liberty Mutual's settlement essentially ensured that this litigation would not die.

Moreover, equity requires the Court to "prevent one of two or more guarantors from being obliged to pay more than his or her fair share of a common burden, or to prevent one guarantor from being unjustly enriched at the expense of another." Thomas, 751 A.2d at 734.  Here, considering the merits of the settlement, and particularly the fact that Liberty Mutual insured Emhart for a significantly longer period under higher policy limits and collected substantially more premiums, the balance of the equities compels the Court to conclude that releasing Liberty Mutual from its post-settlement contribution obligation would result in Century having to bear more than its fair share of a common burden to defend Emhart.  Accordingly, for the

purposes of equitable contribution, the March 24, 2005 settlement had no effect on Liberty Mutual's duty to defend Emhart.

B.   Whether Interest Is Appropriate

Liberty Mutual also argues that it did not share a common burden with Century to pay pre- and post-judgment interest.  This argument is derivative of Liberty Mutual's argument regarding the effect of its settlement (which the Court has held had no effect on its duty to defend Emhart), and the issue requires no further independent analysis. Liberty Mutual is responsible for pre- and post-judgment interest pursuant to R.I. Gen. Laws § 9-21-10.

C.   The Proper Method of Allocation

The Court now turns to the stickier wicket of how to equitably apportion defense costs between the parties. Liberty Mutual argues that Emhart's defense costs should be divided equally between the two coinsurers (the "equal shares" method).  Under this method, each party would bear half of Emhart's $6,317,290.11 defense bill, resulting in Liberty Mutual owing Century $3,158,645.06, less the $250,000 settlement that Century has agreed to discount Liberty Mutual.  (See Century's Mem. in Supp. of Mot. for Summ. J. 15, ECF No. 7.)  Century argues that the costs

13

should be divided according to the length of time each co-insurer's policy overlapped with the period of the risk (the "time on the risk" method).[4]   Under this approach, because Century covered the relevant risk for a total of approximately thirteen months (two consecutive policies, from February 15, 1969 until January 1, 1970) and Liberty Mutual for a total of eighty-six months (eight consecutive policies, from November 1, 1971 until January 1, 1979), Century would absorb 13.13% of the defense bill, or $796,635.19, while Liberty Mutual would refund it for 86.87% of costs, or $5,270,654.92, less the $250,000 settlement that Century agreed to discount Liberty Mutual.

Rhode Island authorities offer limited guidance on choosing a method to allocate equitable contribution where, as here, two successive coinsurers shared the same duty to defend an insured for the same risk.   The Rhode Island

---

[4] Century also draws attention to the fact that, in this situation, courts sometimes apportion costs based on the time and limits on the risk method, which is a modified version of the time on the risk method that takes into account policy limits.   Under this allocation method, Liberty Mutual would owe Century more than under the time on the risk method, given that its policies were not only in effect longer but also had greater limits.   However, because Century argues that time on the risk is "the most equitable of the three approaches" (Century's Mem. in Supp. of Mot. for Summ. J. 15, ECF No. 7), there is no reason to consider the time and limits on the risk method.

Supreme Court has found it "proper to prorate defense costs between concurrent insurers, when . . . both insurers have wrongfully refused to defend an insured." Peloso v. Imperatore, 434 A.2d 274, 279 (R.I. 1981). However, the issue in Peloso was allocation between concurrent coinsurers, so it is not necessarily predictive of how the Rhode Island Supreme Court would allocate defense costs between successive coinsurers. Moreover, no Rhode Island court has had occasion to address equitable contribution in the context of a long-term progressive environmental injury, leaving the Court in uncharted, but navigable, waters.

The public policy considerations regarding insuring progressive injuries provide a good starting point and an appropriate backdrop for the present analysis. Unlike commonplace single-occurrence injuries, such as car accidents, long-term environmental "[p]rogressive injuries. . . are 'indivisible injuries attributable to ongoing events without a single clear "cause."'" Boston Gas Co. v. Century Indem. Co., 910 N.E.2d 290, 300 (Mass. 2009) (quoting Boston Gas Co. v. Century Indem. Co., 529 F.3d 8, 13 (1st Cir. 2008)). Progressive injuries can therefore occur over a period of time during which the liable party

has coverage under several different insurers with multiple policies running concurrently and/or successively. Michael G. Doherty, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257, 258 (1997). Where this occurs, it can be "both scientifically and administratively impossible to allocate to each policy the liability for injuries occurring only within its policy period." Id. at 257-58; see also EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's, 934 A.2d 517, 521 (N.H. 2007) ("[I]n long-term environmental pollution cases, correlating degrees of damage to particular points along the loss timeline may be virtually impossible, which has led to substantial uncertainty as to how responsibility for such losses should be allocated where multiple insurers have issued successive policies to the insured over the period of time the damage was developing.") (internal quotation marks and citation omitted); 15 Couch on Insurance § 220:25.

Given the complexities involved in allocating liability for a progressive injury between successive coinsurers, courts have adopted various approaches for allocating indemnity and defense costs between insurers and insureds or between insurers themselves. See, e.g.,

EnergyNorth, 934 A.2d at 521 ("By contrast, in long-term
environmental pollution cases, 'correlating degrees of
damage to particular points along the loss timeline may be
virtually impossible[,] [which] has led to substantial
uncertainty as to how responsibility for such losses should
be allocated where multiple insurers have issued successive
policies to the insured over the period of time the damage
was developing." (quoting Pub. Serv. Co. v. Wallis & Cos.,
986 P.2d 924, 935 (Colo. 1999)) (brackets in original));
see also Keene Corp. v. Ins. Co. of N. Am., 667 F.2d 1034,
1050 (D.C. Cir. 1981) (adopting the joint and several
liability method); Ins. Co. of N. Am. v. Forty-Eight
Insulations, Inc., 633 F.2d 1212, 1213-14 (6th Cir. 1980)
(adopting the time on the risk method); Uniroyal, Inc. v.
Home Ins. Co., 707 F. Supp. 1368, 1392 (E.D.N.Y. 1988)
(adopting the stacking coverage or horizontal exhaustion
method); Owens-Illinois, Inc. v. United Ins. Co., 650 A.2d
974, 995 (N.J. 1994) (adopting a method that is "related to
both the time on the risk and the degree of risk assumed");
J.H. France Refractories Co. v. Allstate Ins. Co., 626 A.2d
502, 509 (Pa. 1993) (adopting the other insurance clause
method).

17

This lack of consensus as to how to allocate progressive injury liability has led to a "litigation bonanza for lawyers." William R. Hickman & Mary R. DeYoung, Allocation of Environmental Cleanup Liability Between Successive Insurers, 17 N. Ky. L. Rev. 291, 294 n.6 (1990). Insurers have an incentive to renounce indemnification and defense duties in the hope that courts will adopt a more favorable allocation method. The fractured state of the law also decreases settlement incentives,[5] which means more litigation and increased transaction costs for everyone. The net effect of all this is that underwriters face substantial uncertainty in calculating risk and exposure for progressive injuries. This, no doubt, works its way back to consumers, who must pay higher premiums for general liability coverage. See Boston Gas, 910 N.E.2d at 314 (holding in the context of indemnification allocation: "We are persuaded that the time-on-the-risk method of allocating losses is appropriate where the evidence will not permit a more accurate

---

[5] "[U]ncertainty as to outcome is the key to the settlement rate . . . . This uncertainty leads each party to overestimate its chance of prevailing." Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1475 n.3 (Fed. Cir. 1998) (quoting Richard A. Posner, The Federal Courts: Challenge and Reform 89-94 (1996) (internal citation omitted)).

allocation of losses during each policy period. '[I]ts inherent simplicity promotes predictability, reduces incentives to litigate, and ultimately reduces premium rates.'" (quoting Doherty, supra at 281)). With an eye on these public policy considerations, the Court will turn to the two competing allocation methods advocated by the parties.

1.   Other Insurance Clauses

Liberty Mutual argues that allocation based on equal shares is supported by the terms of the parties' respective policies. Specifically, the parties "other insurance" clauses identically state that where other insurers' policies "apply to the loss on the same basis" and "provide[] for contribution by equal shares," then such coinsurers "shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share . . . ." (Liberty Mut.'s Statement of Undisputed Facts ¶ 26, ECF No. 38-5 [SEALED].)  In other words, where two policies cover the same loss and provide for equal shares allocation, then loss shall be allocated on that basis.   Although these clauses pertain to indemnification, Liberty Mutual argues that the parties' other insurance clauses should be taken into consideration

in choosing an equitable allocation method for defense costs. See Fed. Ins. Co. v. Cablevision Sys. Dev. Co., 836 F.2d 54, 57 (2d Cir. 1987) (affirming district court's finding that "the 'other insurance' clauses demonstrated an intent to apportion indemnity loss equally," and that "while an intent by coinsurers to apportion indemnity loss equally does not control the division of defense costs as a matter of law, that intent is an important factor of reference with respect to such division").

Liberty Mutual's plaint falls short. The other insurance clauses function to prevent double recovery where two or more insurers concurrently cover the same risk; they are inapposite to the issue of how to allocate defense costs between successive coinsurers. See Pacitti v. Nationwide Mut. Ins. Co., C.A. No. 89-1999, 1991 WL 789894, at *4 (R.I. Super. Oct. 4, 1991), aff'd 626 A.2d 1284 (R.I. 1993) ("'Other insurance' clauses evolved primarily to protect insurers against situations where an insured would be entitled to receive double insurance benefits covering a single loss."); see also Taco Bell Corp. v. Cont'l Cas. Co., 388 F.3d 1069, 1078-79 (7th Cir. 2004) (criticizing district court's reliance on other insurance clauses to apportion defense costs equally where the parties' policies

were successive); <u>St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.</u>, 919 F.2d 235, 241 (4th Cir. 1990) (stating that other insurance clauses "apply only when the coverage is concurrent.  Where, as here, the policies['] periods did not overlap at all, such clauses are not applicable"); <u>Boston Gas Co.</u>, 910 N.E.2d at 308 ("[P]olicies' 'other insurance' clauses do not reflect an intention to cover losses from damage outside the policy period.  Rather, the 'other insurance' clauses simply reflect a recognition of the many situations in which concurrent, not successive, coverage would exist for the same loss."); <u>Consol. Edison Co. of N. Y. v. Allstate Ins. Co.</u>, 774 N.E.2d 687, 694 (N.Y. 2002) ("Such clauses apply when two or more policies provide coverage during the same period, and they serve to prevent multiple recoveries from such policies.") (internal citations omitted); Allan D. Windt, <u>Insurance Claims and Disputes</u> § 4:45 (5th Ed. 2011) ("[C]ourts should not look to the 'other insurance' clauses in policies that afford consecutive coverage in allocating defense (or, for that matter, indemnity) costs.  Such clauses are relevant only as when there is an identity of risk among the insurers.").  The authorities speak for

themselves.   The other insurance clauses are not relevant here.

      2.   Equal Shares v. Time on the Risk

Turning first to the equal shares allocation method, the courts that have adopted it have usually relied on the reasoning that an insurer's "duty to defend is broader than the duty to indemnify." Mellow v. Med. Malpractice Joint Underwriting Ass'n of R.I., 567 A.2d 367, 368 (R.I. 1989); see also Global NAPs, Inc. v. Fed. Ins. Co., 336 F.3d 59, 62 (1st Cir. 2003) (quoting Bos. Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 545 N.E.2d 1156, 1158 (Mass. 1989)).   The Minnesota Supreme Court succinctly explained the rationale underlying this principle as follows: "(1) the duty to defend extends to every claim that 'arguably' falls within the scope of coverage; (2) the duty to defend one claim creates a duty to defend all claims; and (3) the duty to defend exists regardless of the merits of the underlying claims." Wooddale Builders, Inc. v. Maryland Cas. Co., 722 N.W.2d 283, 302 (Minn. 2006); see also 14 L.R. Russ & T.F. Segalla, Couch on Insurance § 200:3 (3d ed. 2005) ("The duty to defend is likewise broader than the duty to indemnify.   Accordingly, the insurer has a duty to defend an insured against a lawsuit based merely on the

potential of liability under a policy, despite the fact that the insurer could eventually be determined to have no duty to indemnify the insured."). As applied to defense costs apportionment, these courts have reasoned that, because coinsurers' duties to defend their insured are coextensive, each coinsurer should bear the same share of the cost of defending the insured. See Fed. Ins., 836 F.2d at 58 ("Under New York law, the duty of each of the three insurers to defend Cablevision is separate and equal. Since the insurers cannot defend 'part' of the antitrust claims against Cablevision in the underlying Nishimura action, it is logical that the insurers bear the costs of defense equally."); see also Emons Indus., Inc. v. Liberty Mut. Fire Ins. Co., 481 F. Supp. 1022, 1026 (S.D.N.Y. 1979) (rejecting time on the risk allocation in favor of equal shares because, "the disparate number of years of coverage notwithstanding, both insurance companies stand on equal footing with respect to potential liability and their concomitant duty to defend"). This rule is attractive in its simplicity: equal defense burdens require equal contributions to defense costs.

The time on the risk method, alternatively, was specifically "developed as a solution for the problem of

toxic torts and industrial diseases, where damage--and liability--may be found to span the term of several policies of insurance." Taco Bell Corp. v. Cont'l Cas. Co., No. 01 C 0438, 2003 WL 1475035, at *14 (N.D. Ill. Mar. 17, 2003) (quoting 15 Couch on Insurance § 217:9). Courts reasoned that, unlike a single-occurrence injury, the protracted nature of a progressive injury lends itself to "a reasonable means" proration based on the number of years of exposure. Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Ins., 826 A.2d 107, 123 (Conn. 2003); see also Forty-Eight Insulations, 633 F.2d at 1225. Time on the risk is the allocation method "applied by the vast majority of courts allocating liability." U.S. Fid. & Guar. Co. v. Treadwell Corp., 58 F. Supp. 2d 77, 105 (S.D.N.Y. 1999) (adding that "the method is 'predictable, administrable, fundamentally fair, and provides potential insureds with incentives to purchase insurance or rationally self-insure'" (quoting Doherty, supra, at 260)).

In Forty-Eight Insulations, the Sixth Circuit held that, as "indemnity costs can be allocated by the number of years [of exposure][,]" then "[t]here is no reason why this same theory should not apply to defense costs." 633 F.2d at 1225. Courts have since frequently allocated defense

24

costs based on time on the risk, finding it equitable because it tends to limit coinsurers' responsibility for defense costs arising out of occurrences falling outside of their respective policy periods. See Towns v. N. Sec. Ins. Co., 964 A.2d 1150, 1167 (Vt. 2008) (citing Gulf Chem. & Metallurgical Corp. v. Assoc. Metals & Minerals Corp., 1 F.3d 365, 371-72 (5th Cir. 1993) (reasoning that "[t]he insurer has not contracted to pay defense costs for occurrences which took place outside the policy period" and therefore applying Texas law to reject joint and several liability and instead apportion defense costs among multiple insurers on a pro rata basis)); Commercial Union Ins. Co. v. Sepco Corp., 918 F.2d 920, 924 (11th Cir. 1990) (declining to hold insurer responsible "to provide defense for exposure unquestionably outside of its coverage" and therefore upholding trial court's pro rata apportionment of defense costs); see also USF Ins. Co. v. Clarendon Am. Ins. Co., 452 F. Supp. 2d 972, 1004 (C.D. Cal. 2006); Sec. Ins., 826 A.2d at 123; Deutsche Bank Trust Co. Ams. v. Royal Surplus Lines Ins. Co., No. 06C-09-261 JAP, 2011 WL 765552, at *26 (Del. Super. Feb. 25, 2011); Owners Ins. Co v. Ill. Union Ins. Co., No. 1 CA-CV 07-0115, 2007 WL 5471953, at *1 (Ariz. App. Div. 1 Dec. 24, 2007); Centennial Ins. Co. v.

U.S. Fire Ins. Co., 88 Cal. App. 4th 105, 113-14 (Cal. Ct. App. 2001).

By corresponding insurers' defense cost obligations to their policy periods, courts have found that time on the risk serves to align insurers' defense cost expectations with the proportion of risk that they assume based on the duration of their policy. See Forty-Eight Insulations, 633 F.2d at 1224-25 ("An insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period."); Security Ins., 826 A.2d at 123 ("Neither the insurers nor the insured could reasonably have expected that the insurers would be liable for losses occurring in periods outside of their respective policy coverage periods."). Equal shares allocation, on the other hand, wholly aligns insurer expectations to the arbitrary proportion of other coinsurers that the insured might happen to have during the relevant period of risk.

Thus, by providing insurers with a measure of future risk, time on the risk reduces underwriting uncertainty. As one commentator has explained (in the context of indemnification):

> In addition to decreasing the amount of
> litigation, [the time-on-the-risk] method
> provides a way for insurance companies to
> estimate more accurately total expected
> liability; as a result, premiums should decline.
> Premiums reflect the uncertainty that exists in
> the insurance market and the possibility that
> courts will use a coverage maximization rule to
> allocate coverage. Uncertainty about which
> allocation method will be used and how that
> method will be applied increases the costs of
> insurance. Consistent use of the time-on-the-
> risk method will eliminate the concern about
> uncertainty. Because this method . . . does not
> rely on a case-by-case determination of how much
> coverage was purchased, it also obviates the
> concern about inconsistent application.

Doherty, supra, at 282-83. It would be too far a stretch
to say that consistent use of the time on the risk method
would completely eliminate uncertainty at the underwriting
stage. Of course, even time on the risk is dependent upon
the number of other coinsurers covering the relevant
policyholder's risk. However, where policies are issued on
an annual basis, as here, it is more predictable in the
sense that underwriters know that longer general liability
policy coverage periods will always mean larger defense
burdens. This result does not follow from equal shares
allocation or allocation methods that take policy limits
into account. Unlike equal shares, time on the risk does
not require underwriters to calculate premiums by relying
exclusively on guesswork as to the number of other

coinsurers who could potentially cover the insured over the life of a long-term injury (or speculate as to their respective policy limits--as an allocation based on limits would require).[6]   Thus, time on the risk more equitably limits liability for defense costs to the slice of progressive injury that providers choose to insure, which, in turn, advances the public policy goals of reducing underwriting uncertainty and lowering premiums for consumers.

Moreover, the Court cannot ignore the disparity between the duration of the parties' coverage.  See USF Ins., 452 F. Supp. 2d at 1004 (rejecting equal shares contribution allocation in favor of time on the risk because one coinsurer covered insured for only three months while two others provided coverage for twelve months);

_____

[6]   Addressing transaction costs, Liberty Mutual relies on Wooddale Builders, Inc. v. Maryland Casualty Co., in which the Minnesota Supreme Court adopted the equal shares method, reasoning that "[i]f insurers know from the beginning that defense costs will be apportioned equally among insurers whose policies are triggered, the possibilities for delay will be minimized because no insurer will benefit from delaying or refusing to undertake a defense."  722 N.W.2d 283, 303-304 (Minn. 2006).  The case is inapposite, however, because under Minnesota law, "an insurer that undertakes the defense of its insured may not seek recovery of defense costs from the insured's other insurers who also owed a duty to defend but failed to provide a defense."  Id. at 302.

Owners Ins., 2007 WL 5471953, at *3-4 (rejecting equal shares in favor of time on the risk where plaintiff coinsurer provided approximately 93.3% of total length of insured's coverage whereas defendant coinsurer provided approximately 6.7%). In a factually similar case involving the same issue that is before this Court--equal shares versus time on the risk--a California court disposed of the question as follows:

> On the facts before us, we have no difficulty concluding that in this particular case, the time on the risk method was more equitable than the equal shares approach. U.S. Fire was responsible for insuring Lincoln for a period of less than six months between January 19, 1982, through July 1, 1982, only a small fraction of the total insurance coverage period of four and one-half years provided to Lincoln by Centennial, Travelers and U.S. Fire together. In order to adopt the equal shares method of allocation advanced by Centennial, the trial court would have been required simply to ignore the relative length of time each of the several insurers was actually responsible for insuring the acts of Lincoln and was receiving insurance premiums for bearing that risk. Had the trial court applied an equal shares allocation, U.S. Fire would have had exactly the same liability for defense costs as Centennial and Travelers, even though the latter two insurers had covered Lincoln for nearly 90 percent of the duration of the combined policy period and had also collected premiums for that longer period of coverage accordingly. Such a result would have been patently arbitrary and inequitable.

Centennial Ins., 88 Cal. App. 4th at 113-14.

Here, Century was on the risk for approximately 13% of the total length of coverage provided by the two parties. Where neither party undertook a duty to defend Emhart, the Court cannot agree that equity should require Century to shoulder 50% of Emhart's defense burden--especially considering that Liberty Mutual insured Emhart for substantially higher policy limits and collected more premiums than Century.

Finally, the Court is satisfied that time on the risk allocation is compatible with Rhode Island Supreme Court precedent.   In Peloso v. Imperatore, the insured brought suit for reimbursement of defense costs from two coinsurers who covered the same risk for the same amount of time.   The Court allocated defense costs pro rata by policy limits, reasoning that a failure to prorate would advance a rule in which an insurer who abdicates its "duty to defend would be awarded a bonus for having done so, by having another company bear the entire cost."   434 A.2d at 279 (quoting Marwell Constr., Inc. v. Underwriters at Lloyd's, London, 465 P.2d 298, 313 (Alaska 1970)).   Century points out that, because the case involved allocation between concurrent coinsurers of the same risk, "[n]o set of facts could better support the position that equal sharing is the

fairest" allocation method.   (Century's Reply Mem. in Supp. of Mot. for Summ. J. 10, ECF No. 46-2 [SEALED].)   The Court does not disagree.   If the Rhode Island Supreme Court views proration by policy limits as the equitable approach to allocating defense cost contribution between coinsurers covering the same risk for the same duration, this Court can think of no principled reason why it would not do the same where coinsurers covered the same risk for differing durations.   At a minimum, this Court is satisfied that it would not apportion defense costs by equal shares in the case of successive coinsurers.

III. Conclusion

For all of these reasons, Century's motion for summary judgment is GRANTED and Liberty Mutual's cross-motion for summary judgment is DENIED.   The Court will allocate equitable contribution for Emhart's defense costs based on the parties' respective time on the risk, as computed by Century, and Century shall recover from Liberty Mutual 86.87% of the $6,067,290.11[7] judgment (or $5,270,654.92) it

_____

[7] This is the amount that was provided to the Court by Century in its Statement of Undisputed Facts, and it includes both pre- and post-judgment interest.

paid in satisfaction of this Court's November 16, 2007 order, less the $250,000 settlement amount.[8]

IT IS SO ORDERED.


/s/ William E. Smith
William E. Smith
United States District Judge
Date: September 6, 2011

---

[8] Century bases its calculation on the assumption that the parties collectively insured Emhart for ninety-nine months, Century for thirteen months and Liberty Mutual for eighty-six months, and by computing each insurer's proportionate share as a direct ratio of the sum of their combined policy limits. (See Century's Mem. in Support of Mot. for Summ. J. 15-16; see also Century's Statement of Undisputed Facts ¶¶ 8, 16, 17, ECF No. 6.)

The Court notes, however, that Liberty Mutual's undisputed fact ¶ 25, which Century indeed does not dispute, suggests that Liberty Mutual provided coverage to Emhart for ninety-six (rather than eighty-six) months. (See Liberty Mut.'s Statement of Undisputed Facts ¶ 25, ECF No. 38-5 [SEALED] ("Liberty Mutual issued certain comprehensive primary and excess general liability policies to Emhart's corporate predecessor, United Shoe Machinery Corporation, from November 1, 1971 through November 1, 1979."); see also Century's Statement of Disputed Facts ¶ 25, ECF No. 46-3 [SEALED].) The Court will not second-guess Century's calculation as it appears to be the most conservative and favors the non-prevailing party; however, Century is granted leave to file a motion to amend the judgment if its computations resulted from a clerical error.